The YANKTON SIOUX TRIBE OF INDIANS, Plaintiff,

v.

Kenneth NELSON, Daniel Svotas and De Wit Harold, Defendants,

and

State of South Dakota, Intervenor-Defendant,

and

County of Charles Mix, South Dakota, Intervenor-Defendant.

No. CIV76–4066.

United States District Court, D. South Dakota, S. D.

Sept. 19, 1981.

Yvonne T. Knight, Boulder, Colo., and Arlinda Locklear, Washington, D. C., for plaintiff.

Warren R. Neufeld, Asst. Atty. Gen., Pierre, S. D., for intervenor-defendant State of South Dakota.

Tom D. Tobin, Winner, S. D., and David Albert Mustone, Washington, D. C., for intervenor-defendant County of Charles Mix, S. D.

## MEMORANDUM DECISION

NICHOL, Senior District Judge.

Plaintiff, Yankton Sioux Tribe of Indians, (hereinafter the Tribe), brought this action against defendants Kenneth Nelson, Daniel Svotas and De Wit Harold, all non-Indians, alleging that the Tribe is the owner of the bed underlying Lake Andes, South Dakota, and unlawful trespass on the part of the individual defendants. Subsequently the State of South Dakota (the State) and Charles Mix County intervened as defend-

ants.[1] More specifically, the Tribe alleges that by virtue of the Treaty of 1858, the Tribe is the owner of the bed underlying Lake Andes, South Dakota, and that in August of 1976, the individual defendants wrongfully entered upon the then dry lakebed[2] and harvested part of the kochia (fireweed) crop. The Tribe further alleges that the harvested crop was converted to the use of the individual defendants. The Tribe seeks declaratory, injunctive and monetary relief for the wrongful entry and conversion of crops.[3]

■ This Court is presented with cross motions for Summary Judgment filed by the Tribe and by the State.[4] There has been extensive briefing and argument by counsel for all parties. The question presented to this Court is one of ownership of the lakebed. Because this Court is presented with a question of law, Summary Judgment is the appropriate vehicle for resolution of that question. Based upon the briefs and arguments of counsel, and for the reasons stated below, this Court holds that title to the bed of Lake Andes, South Dakota, rightfully rests in the Tribe. Therefore, the State's Motion for Summary Judgment is denied, and the Court grants the Tribe's Motion for Summary Judgment.

The facts in this case are, for the most part, undisputed. In the year 1858, the Tribe treated with the United States Government. The 1858 Treaty provided that the "tribe of Indians do hereby cede and relinquish to the United States all the lands now owned, ... *except four hundred thousand acres....*" Treaty with The Yankton Sioux, 1858, Art. 1, 11 Stat. 743 (emphasis supplied). Lake Andes is within the unceded portion of the Tribe's land as described in said Treaty. *See* Maps of Yankton Reservation, Exhibit A attached to plaintiff's Motion for Summary Judgment.

The Treaty further provided that "all lands embraced in said limits are their own, and that they have full and exclusive right to cede and relinquish the same to the United States." *Id.* Art. 2.

In 1976, Lake Andes went completely dry. A wild crop of kochia, or fireweed, grew up on the lakebed. In the week of August 9, 1976, the individual defendants went onto the lakebed and harvested the kochia crop under the authority of the South Dakota Department of Game, Fish & Parks. On August 13, 1976, the Tribe filed this action in district court.

On November 29, 1976, the Tribe moved for Summary Judgment alleging that there existed no issues of fact and that the Tribe owned the lakebed as a matter of law. The Tribe alleges that by virtue of the Treaty of 1858, wherein the Tribe conveyed to the United States all their land except four hundred thousand acres, the Tribe owns the bed underlying Lake Andes. The Tribe claims that since its title to the lakebed has not been extinguished the Tribe is the rightful owner of the lakebed.

Charles Mix County and the State, in opposition to the Tribe's Motion for Summary Judgment, contend that the issue of navigability of Lake Andes, being a question of fact, renders Summary Judgment inapposite. The State, however, later made its own Motion for Summary Judgment wherein the State submits that based upon the extensive record before the Court, including a large number of affidavits concerning the question of navigability, the Court should find that Lake Andes is non-navigable. Upon a finding that Lake Andes is non-navigable the State argues further that in allotting the Yankton Sioux Reservation and ceding the unallotted lands back to the United States, that the Tribe, as

1. The individual defendants were dismissed from the action with prejudice by stipulation of all parties on May 21, 1979.

2. The level of the lake ebbs and flows depending upon the amount of rainfall received during any particular year. When the action was brought the lakebed was dry. It is not now dry.

3. Plaintiff sought and was granted a Temporary Restraining Order on August 13, 1976.

4. The Tribe's Motion for Summary Judgment was filed on November 29, 1976. The State of South Dakota's Motion for Summary Judgment was filed on July 27, 1978.

well as the United States, intended to terminate tribal ownership of the lakebed. The State attempts, by submission of extensive legislative and administrative histories consisting mostly of Commissioners Reports, to demonstrate that the allotment policy was to encourage assimilation, destroy communal ownership of the land, and close the reservation. The State's final contention is whoever the United States transferred the land to when it approved the riparian allotments is the owner of the lakebed today. That, the State argues, should be the State or other successors in title.

The United States Supreme Court has dealt with somewhat similar questions on three occasions in the past. Most recently, in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Supreme Court held that language providing that land set apart for the absolute and undisturbed use and occupation of the Indians "did not reserve to the Indians any claim to the bed underlying the Big Horn River in Montana." The Supreme Court held that the treaty language was not strong enough to overcome the presumption against the United States' conveyance to the Union. *Id.* at 553, 101 S.Ct. at 1252. Therefore, title to the Big Horn River bed passed to Montana when Montana became a state.

In *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), the Supreme Court held, contrary to Oklahoma's claims, that the Indian parties to the suit did receive title to the land underlying the navigable portion of the Arkansas River from its confluence with the Grand River to the Oklahoma-Arkansas border. *Id.* at 635–36, 90 S.Ct. at 1336–37. To resolve the question of title to the riverbed, the Supreme Court looked to the treaty language itself and to the circumstances surrounding the creation of the reservation. One of the distinguishing factors was the removal of the Indians from their aboriginal lands and their repeated relocation further west. That factor, plus the treaty language that "no part of the land granted to them shall ever be embraced in any Territory or State" compelled the Supreme Court to conclude that the United States intended to convey the bed of the Arkansas River to the Indians involved.

In *United States v. Holt State Bank,* 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926), the Supreme Court held that title to Mud Lake, a navigable body of water, did pass to Minnesota upon that state's admission to the Union. Aboriginal title to the land in question was surrendered to the United States prior to the creation of the reservation. *Holt State Bank* is well known as one of the primary sources for the proposition that "disposals of land by the United States during the territorial period are not lightly inferred and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain." *Id.* at 55, 46 S.Ct. at 199. One important factor is present in each of the above cases. In each case the United States had extinguished the Indian right of occupancy prior to the creation of the respective Indian reservations.

█ This Court has been guided not only by the precedents cited above, but also by the so-called canons of construction of Indian Law. Although treaty rights are sometimes clearly expressed in the document, frequently there is some doubt as to the rights created. The courts have been liberal in recognizing the existence of Indian treaty rights in those instances where the rights are not clearly stated. Three primary rules have been developed in treaty interpretation: Ambiguous expressions must be resolved in favor of the Indian parties concerned; Indian treaties must be interpreted as the Indians themselves would have understood them; and Indian treaties must be liberally construed in favor of the Indians. *See e. g., Choctaw Nation v. Oklahoma,* 397 U.S. 620, 621, 90 S.Ct. 1328, 1329–30, 25 L.Ed.2d 615 (1970); *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 98, 39 S.Ct. 40, 51, 63 L.Ed. 138 (1918); *Jones v. Meehan,* 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1899).

█ The Tribe established by affidavit that it held aboriginal title to the land in

question. *See* Exhibits C, D and I–M, attached to the Tribe's Memorandum in Support of Motion for Summary Judgment. When the United States acquired the Louisiana Purchase all that it gained with respect to the Indian land therein was "an exclusive right to extinguish the Indian title of occupancy, either by purchase or conquest." *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 586, 5 L.Ed. 681 (1823). The Indian right of occupancy is considered as sacred as the fee simple of white society. *Mitchel v. United States*, 34 U.S. (9 Pet.) 711, 746, 9 L.Ed. 283 (1835). *See also United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941). The United States Supreme Court has repeatedly held that aboriginal title survives unless and until expressly extinguished by the United States. *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667–70, 94 S.Ct. 772, 777–79, 39 L.Ed.2d 73 (1974), and cases cited therein. Because the United States has not expressly extinguished the Indian right of occupancy, the Tribe continues to hold title to the bed underlying Lake Andes unless and until the United States does expressly extinguish the Indian title.

Unlike the treaty that created the reservation involved in *Montana v. United States*, the 1858 Treaty with the Tribe created a reservation out of unceded aboriginal land. Aboriginal title to the Yankton Sioux Reservation was not extinguished. By contrast, the second Treaty of Fort Laramie expressly conveyed land from the United States to the Crow Tribe. *Montana v. United States*, 450 U.S. at 553, 101 S.Ct. at 1252.

The language of the Tribe's 1858 Treaty also distinguishes the case at bar from *Holt State Bank, supra*. In each of the last two treaties that created the reservations under discussion in *Holt State Bank*, the Indians ceded to the United States all right, title, and interest in the disputed land. *See* 10 Stat. 1109, Art. 1, and 10 Stat. 1165, Art. 1. In return for the complete cession of all Indian rights to the disputed land the United States reserved certain lands for the Indians' use. *See* 10 Stat. 1109, Art. 2, and 10 Stat. 1165, Art. 2. In the case at bar the lakebed was never expressly ceded to the United States; rather, the Tribe reserved land to themselves from their cession to the United States: "The said chiefs and delegates of said tribe of Indians do hereby cede and relinquish to the United States all the lands now owned, possessed, or claimed by them, wherever situated, *except four hundred thousand acres thereof. . . .*" 11 Stat. 743, Art. 1. Given the canons of construction of Indian law, it is clear that the Tribe did not convey its aboriginal title to the bed underlying Lake Andes by the terms of the 1858 Treaty, nor was the lakebed itself expressly ceded by the Tribe during the allotment process. Because the United States did not expressly extinguish the Tribe's aboriginal title to Lake Andes in the 1858 Treaty, the United States had no title to pass to South Dakota upon its admission to the Union.

IT IS THEREFORE ORDERED THAT the State's Motion for Summary Judgment is DENIED, and

IT IS FURTHER ORDERED THAT the Tribe's Motion for Summary Judgment is GRANTED.