The YANKTON SIOUX TRIBE OF
INDIANS, Plaintiff,

and

United States of America,
Intervenor-Plaintiff
Cross-Claimant,

v.

Kenneth NELSON, Daniel Svotas, and
De Wit Harold, Defendants,

and

The State of South Dakota and Charles
Mix County, South Dakota,
Intervenor-Defendants.

No. CIV 76–4066.

United States District Court,
D. South Dakota, S.D.

March 21, 1985.

John W. Keller, Jr., Huron, S.D., Arlinda Locklear, Native American Rights Fund, Washington, D.C., Yvonne Knight, Native American Rights Fund, Boulder, Colo., for plaintiff.

Tom D. Tobin, Winner, S.D., David Albert Mustone, Tobin Law Offices, Washington, D.C., for Charles Mix County, S.D.

Ray P. Murley, Asst. U.S. Atty., Sioux Falls, S.D., John E. Lindskold, Atty., U.S. Dept. of Justice, Land & Natural Re-

sources Div., Denver, Colo., for U.S. of America.

Daniel J. Doyle, Asst. Atty. Gen., Natural Resources Section, Pierre, S.D., for State of S.D.

## MEMORANDUM DECISION AND ORDER

NICHOL, Senior District Judge.

### INTRODUCTION

The controversy before the Court involves the ownership of the bed of Lake Andes. Ownership is claimed by the plaintiff, Yankton Sioux Tribe of Indians (Tribe) and by the intervenor-defendant State of South Dakota (State). The intervenor-defendant County of Charles Mix (County) claims a governmental interest, but no direct proprietary interest. The intervenor-plaintiff and cross-claimant United States of America (United States) wishes to protect a perpetual easement in the lakebed which the State conveyed to the United States in 1939 for the purpose of maintaining a wildlife refuge.

### FACTS

The facts of the case are not complex, and are set out in *Yankton Sioux Tribe of Indians v. Nelson*, 521 F.Supp. 463 (D.S.D. 1981) (hereinafter called the 1981 Decision). It is necessary to add those facts which relate to the claims of the United States, because the United States did not intervene until 1983.

The Lake Andes Migratory Waterfowl Refuge was established in 1936 by executive order.[1] At that time, the United States acquired about 365 acres of land in Charles Mix County, and the refuge was opened. During the following three years, the refuge was enlarged somewhat by the acquisi-

tion of flowage easements from riparian landowners.

On November 25, 1939, the State conveyed an easement in the entirety of the bed of Lake Andes to the United States. The United States has maintained and improved the refuge since that time.

### PROCEDURAL HISTORY

The lawsuit was filed in August of 1976 by the Tribe against the individual defendants, to enjoin them from harvesting kochia (fireweed) from the then-dry lakebed. The State and County promptly intervened, and the individual defendants were dismissed. On September 19, 1981, this Court decided that the Tribe owns the lakebed, and therefore granted the Tribe's motion for summary judgment.[2]

The decision was appealed to a panel of the Eighth Circuit Court of Appeals, which did not reach the merits, but remanded the case to this Court for a factual determination regarding the navigability of Lake Andes.[3] The issue of navigability was subsequently resolved in the Tribe's favor,[4] and summary judgment for the Tribe was entered August 5, 1983. Subsequently both the Tribe and the County and State (jointly) moved to amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.

On September 1, 1983, the United States moved to intervene and also for leave to supplement the record. The motion to intervene, which was unopposed, was granted in November of 1983. Thereafter, the United States and the Tribe filed cross motions for summary judgment.[5] The State and County also filed a motion for summary judgment against the Tribe.[6]

The following motions are therefore before the Court: the Tribe's Rule 59(e) mo-

---

1. Executive Order No. 7292, February 14, 1936.

2. *Yankton Sioux Tribe of Indians v. Nelson*, 521 F.Supp. 463 (D.S.D.1981).

3. *Yankton Sioux Tribe of Indians v. Nelson*, 683 F.2d 1160 (8th Cir.1982).

4. *Yankton Sioux Tribe of Indians v. Nelson*, 566 F.Supp. 1507 (D.S.D.1983).

5. The Tribe's motion for summary judgment was filed December 1, 1983; the United States' motion was filed February 22, 1984.

6. Filed January 5, 1984.

tion to amend the judgment, the Rule 59(e) motion of the State and County to amend the judgment, the Tribe's motion for summary judgment as against the United States, the United States' motion for summary judgment as against the Tribe, the joint motion for summary judgment of the State and County as against the Tribe, and the United States' motion for leave to supplement the record.[7]

## CLAIMS OF THE UNITED STATES

The Tribe asserts that the actions of the United States in this matter constitute a serious breach of faith, and are offensive to the most basic tenets of the United States' trust responsibility toward the Tribe. I agree.

The United States Supreme Court established in *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), that the relationship of the United States to an Indian tribe resembles that of a guardian to his ward. The concept of a federal trust responsibility toward Indians has since become a cornerstone of Indian law. F. Cohen, *Handbook on Federal Indian Law* at 220–21 (1982 ed.). Refining the concept, courts have imposed the fiduciary obligations of a private trustee on the United States when dealing with Indians, *Seminole Nation v. United States*, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942), held that the United States, when administering Indian property, is bound by the same principles of law as would be applied to an ordinary fiduciary, *Navajo Tribe v. United States*, 364 F.2d 320, 322–24, 176 Ct.Cl. 502 (1966), and allowed Indian tribes to sue the United States to enjoin a breach of that fiduciary duty, *see, e.g., Pyramid Lake Paiute Tribe v. Morton*, 354 F.Supp. 252 (D.D.C.1972). In the instant case, the actions of the United States toward the Tribe must therefore be examined in light of the duty of loyalty owed a beneficiary by its trustee.

The action was commenced in August of 1976. The State and County intervened shortly thereafter. Over the next six years the United States showed no inclination to attempt intervention, even when the Court formally invited such intervention by order dated October 28, 1982. When no response to the Court's invitation was heard by July 25, 1983, nine months later, the Court entered its Findings of Fact on Remand and denied the motion by the State and County to join the United States as a party.[8] On September 1, 1983, the United States finally moved to intervene. The United States' motion was made without excuse, apology or explanation for the delay, and none has been offered in the ensuing months. Because the United States threatened a separate lawsuit if its motion to intervene was denied, the Tribe did not oppose the motion. The motion was therefore granted. "[I]t would [have been] a senseless waste of judicial resources to require the parties to begin again merely to arrive at the same place." *Kelly v. Carr*, 691 F.2d 800, 806 (6th Cir.1980).

The conduct of the United States, when examined in the harsh light of its fiduciary duty, appears shabby and inexcusable. The duty of loyalty owed the Tribe by the United States has been at best ignored, at worst rejected. Nevertheless, given the United States' status as an intervenor, the Court has no alternative but to address the merits of the United States' claims.

The alternative claims made by the United States may be summarized as follows:

1. The Tribe did not have aboriginal title to the lakebed at the time the Treaty of 1858 was executed, and therefore the State acquired title to the bed of Lake Andes in 1889 under the equal footing doctrine.

---

**7.** While the United States intervened as a party plaintiff, its interests are clearly aligned with those of the State. The United States has advised the Court that any dispute between the United States and the State can be resolved by stipulation and therefore need not be decided by the Court.

**8.** *Yankton Sioux Tribe of Indians v. Nelson*, 566 F.Supp. 1507 (D.S.D.1983).

2. The United States acquired any rights or title in the lakebed which the Tribe may have had by virtue of the Cession Agreement of 1892.

3. Any interest or title which the Tribe may have had was extinguished by the Tribe's voluntary abandonment of the bed of Lake Andes.

*Aboriginal title and the Cession Agreement of 1892*

■ As to the first two claims, the United States takes the position that genuine issues of material fact exist which preclude the Court's consideration of summary judgment. I find, however, that the United States is barred from litigating the issues of aboriginal title and the Cession Agreement of 1892 before this Court by application of the doctrine of mutual defensive collateral estoppel, and alternatively because of the United States' status as a post-judgment intervenor in this action.

The purpose of collateral estoppel is to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and by preventing inconsistent decisions, encourage reliance on adjudications." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). The United States Supreme Court has stated that in disputes involving the private rights of private litigants, "no significant harm flows from enforcing a rule that affords a litigant only one full and fair opportunity to litigate an issue, and there is no sound reason for burdening the courts with repetitive litigation." *Standefer v. United States,* 447 U.S. 10, 24, 100 S.Ct. 1999, 2008, 64 L.Ed.2d 689 (1980). Recently, the Supreme Court extended the doctrine of mutual defensive collateral estoppel to bar the government, as well as private parties, from raising the same issue already litigated against the same party in another case involving the same facts. *United States v. Stauffer Chemical Co.,* 464 U.S. 165, ——, 104 S.Ct. 575, 578, 78 L.Ed.2d 388 (1984).

The United States had a full and fair opportunity to litigate the issue of aboriginal title before the Indian Claims Commis-

sion in *Yankton Sioux Tribe v. United States,* 24 Ind.Cl.Comm. 208 (1970). The Commission found that the Tribe had aboriginal title to the lands described in the Commission's Finding of Fact 14, which describes an area including Lake Andes. The United States then had a second opportunity to refute the Tribe's title to the lakebed on appeal to the Court of Claims. That court, however, held that the Commission's order was "in all respects affirmed." *Sioux Tribe v. United States,* 500 F.2d 458, 475, 205 Ct.Cl. 148 (1974).

As to whether the Tribe relinquished its title to Lake Andes in the Cession Agreement of 1892, the United States again had a full and fair opportunity to litigate the issue before the Court of Claims. The case dealt with the compensation paid the Tribe by the United States in 1892; the parties disagreed about the number of acres ceded at that time. The Court of Claims agreed with the trial judge that "the computations of the acreage of the Yankton Sioux Reservation ... by both parties were based upon official plats of surveys which did not include the bed of Lake Andes...." *Yankton Sioux Tribe v. United States,* 623 F.2d 159, 183, 224 Ct.Cl. 62 (1980). The Tribe, concluded the court, was not entitled to compensation for the lakebed. *Id.* at 183–84. Therefore, it follows that the lakebed was not ceded to the United States in 1892, and that the United States is collaterally estopped from raising the issue here.

■ It appears that the United States asks this Court to reach a decision inconsistent with the prior decisions of the Indian Claims Commission and the Court of Claims. This tactic is not new, and has not always been looked upon with favor by other courts. Discussing the government's practice of attempting to relitigate identical issues in different circuit courts, rather than to seek a petition for writ of certiorari to the Supreme Court, one judge noted, "The practice of fomenting inconsistency among various courts of appeals by government officials is unsettling to the course of justice. It is disrespectful toward the courts and hinders efficient judi-

cial administration." *Goodman's Furniture Co. v. United States Postal Serv.*, 561 F.2d 462, 465 (3rd Cir.1977) (Weis, J., concurring). Nor has the practice found a more welcome home in the Eighth Circuit. Chief Judge Lay has stated that asking the Eighth Circuit to relitigate a point lost in the Seventh Circuit is "a government litigation policy which abuses the judicial process." *May Dept. Stores Co. v. Williamson*, 549 F.2d 1147, 1149 (8th Cir.1977) (Lay, J., concurring).

The United States' tactic is no more appropriate between the Court of Claims and this District Court than between two circuit courts of appeals. The policy of consistency remains a reflection of basic equity as well as a reflection of the desire to assure reliability in the judicial process. Levin and Leeson, *Issue Preclusion Against the United States Government*, 70 Iowa L.Rev. 113, 130 (1984). Accordingly, the United States may relitigate neither the aboriginal title question, nor the issue of the Cession Agreement of 1892.

■ Alternatively, I find that the United States, as an intervenor, is bound by this Court's holdings in the 1981 Decision that the Tribe has aboriginal title to Lake Andes, and that the Tribe did not cede the lakebed to the United States in 1892. "[P]ermission to intervene does not carry with it the right to relitigate matters *already determined in the case*, unless those matters would otherwise be subject to reconsideration." *Arizona v. California*, 460 U.S. 605, 614–15, 103 S.Ct. 1382, 1389, 75 L.Ed.2d 318 (1983) (emphasis added).

*Extinguishment of title by abandonment*

A proper analysis of the United States' final claim, that the Tribe's title was extinguished when it voluntarily abandoned the lakebed, requires a comparison of this case with *United States v. Dann*, — U.S. —, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985), a case too recent to have been argued or briefed by the parties here. In *United States v. Dann*, the government claimed, *inter alia*, that Indian title had been extinguished as a result of federal administration of Indian lands for nearly 50 years. The Ninth Circuit Court of Appeals disagreed. The Supreme Court found it unnecessary to reach the merits, and reversed the court of appeals on a narrow question of statutory construction.

In 1951, the Western Shoshone Indians filed a claim with the Indian Claims Commission asserting that the United States owed the Western Shoshones certain sums for the taking of aboriginal title land in several western states. The Commission awarded the Indians a sum in excess of $26 million. 40 Ind.Cl.Comm. 318, 452 (1977). Subsequently, the Danns, defendants in *United States v. Dann*, claimed that the proceedings before the Indian Claims Commission had not decided the question of whether the Indians' title was extinguished, and sought to raise the issue in further litigation.

In 1978, the Ninth Circuit Court of Appeals held that the issue of title to the land claimed by the Danns (a small portion of the land involved in the 1951 claim) had not been decided by the Indian Claims Commission because the question of extinguishment was not in issue in those proceedings and was therefore never litigated. *United States v. Dann*, 572 F.2d 222, 226–27 (9th Cir.1978) (*Dann I*). The court also held in *Dann I* that neither collateral estoppel nor res judicata applied to bar the Danns from litigating the title question because the judgment of the Commission was not "final," in that the money awarded the Western Shoshones had not actually been distributed to the Indians. *Id.*

Following the Ninth Circuit's decision in *Dann I*, but before the case was decided by the district court on remand, the Court of Claims affirmed the money award of the Indian Claims Commission. *Temoak Band of Western Shoshone Indians v. United States*, 593 F.2d 994, 219 Ct.Cl. 346, *cert. denied*, 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). The Supreme Court denied certiorari, and the award was therefore subject to no further judicial review. Accordingly, the Clerk of the Court of

Claims certified the award to the General Accounting Office. The district court, after considering the mandate of the Ninth Circuit in *Dann I*, as well as the decision of the Court of Claims, held that the Indians were barred from relitigating the title issue because title was extinguished as of the date the award was certified to the General Accounting Office. *United States v. Dann*, No. R–74–60 (D.Nev. Apr. 25, 1980).

The case was again appealed to the Ninth Circuit for consideration of two issues:

(1) Whether certification of the award absent actual payment constituted a final determination for purposes of res judicata and collateral estoppel, and

(2) Whether federal administration of the lands in question for nearly 50 years pursuant to the Taylor Grazing Act, 43 U.S.C. section 315 (1976), caused the Indian title to be extinguished.

*United States v. Dann*, 706 F.2d 919 (9th Cir.1983), *rev'd and rem on other grounds*, —— U.S. ——, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985) (*Dann II*).

The appellate court found in favor of the Danns on both issues. The court rejected the government's argument that Indian title was extinguished by federal possession and control of the lands, stating that any actions taken by the executive, and thereafter said to extinguish Indian title, depend for their efficacy on Congress' acquiescence. *Dann II, supra*, 706 F.2d at 929, *citing United States v. Southern Pacific Transp. Co.*, 543 F.2d 676, 689 (9th Cir. 1976). Moreover, the court also alluded to the fiduciary duty of the United States, observing that "[a]n extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *Dann II, supra*, 706 F.2d at 929, *quoting United States v. Santa Fe Pacific R.R.*, 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941).

The United States Supreme Court granted certiorari solely to resolve the narrow question of whether certification of the award and the subsequent placement of funds by the United States into a Treasury account constitutes final payment, discharging the United States of all claims pursuant to section 22(a) of the Indian Claims Commission Act, 25 U.S.C. section 70u(a) (1976). *United States v. Dann, supra*, 105 S.Ct. at 1062. The Court held that final payment had been made, and the claim discharged; therefore, it never reached the issue of whether the United States had extinguished Indian title by administering the lands pursuant to the Taylor Grazing Act, the only issue pertinent to the case at bar. *Id.* Furthermore, the Supreme Court expressly declined to give an opinion as to whether the aboriginal title rights of the individual Indian defendants had been extinguished. *Id.*, 105 S.Ct. at 1065.

The question presented in *United States v. Dann*, regarding finality of payment, is not at issue in the instant case. The Tribe does not claim compensation for any "taking" of Lake Andes, and no such compensation was ever paid. I conclude that *United States v. Dann* is clearly distinguishable from the case at bar, and I may therefore proceed to consider the merits of the United States' claim of abandonment.

All parties agree that no genuine issue of material fact exists, making the question properly before the Court in a motion for summary judgment. The issue presented is whether tribal title to real property can be lost by mere inaction or abandonment, absent a plain and unambiguous expression of intent by Congress to extinguish Indian title. I find that it cannot, and therefore conclude that, even assuming arguendo it is factually correct, the United States' claim of abandonment is insufficient as a matter of law to extinguish the Tribe's title to the bed of Lake Andes.

 There are two types of Indian title: unrecognized or aboriginal title, and title which has been recognized by treaty or executive order. An Indian tribe holding aboriginal title to land has an exclusive right to use and occupy that land, a right that can be extinguished only by the sovereign. *See* F. Cohen, *Handbook on Federal*

*Indian Law* at 487 (1982 ed.), and cases cited therein. Unless the aboriginal title has been expressly extinguished by the United States, any grant or conveyance of the property, whether by the Indian tribe, the United States, or another party under claim of right, is subject to the Indian title and does not extinguish the Indian right of occupancy. *United States v. Santa Fe Pacific R.R.*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941); *Johnson v. McIntosh*, 21 U.S. (8 Wheat) 543, 5 L.Ed. 681 (1821).

In the instant case, the Court held in the 1981 Decision that the Tribe holds aboriginal title to the bed of Lake Andes. As discussed above, the United States is barred from relitigating that question. Furthermore, the Court found in the 1981 Decision that the United States did not expressly extinguish the Tribe's aboriginal title to Lake Andes in the 1858 treaty, and the United States, as an intervenor, is bound by that finding. *Arizona v. California, supra,* 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318.

■ The effect of the Treaty of 1858 on the Tribe's aboriginal title is unmistakable. A treaty is not, as the United States seems to argue here, a grant of rights to the Indians, but is rather a grant of rights from the Indians to the United States. *United States v. Wheeler*, 435 U.S. 313, 327 n. 24, 98 S.Ct. 1079, 1088 n. 24, 55 L.Ed.2d 303 (1978); *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905); *Klamath Indian Tribe v. Oregon Dept. of Fish & Wildlife*, 729 F.2d 609, 611 (9th Cir.), *cert. granted,* —— U.S. ——, 105 S.Ct. 242, 83 L.Ed.2d 180 (1984). When the United States and an Indian tribe negotiate a treaty, all rights not expressly ceded to the United States are thus retained by the tribe. *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208, 98 S.Ct. 1011, 1020, 55 L.Ed.2d 209 (1978); *United States v. Adair*, 723 F.2d

1394, 1413 (9th Cir.1984). The Tribe's aboriginal title to the lakebed, having survived the 1858 treaty, therefore became recognized title. The sole question remaining is whether, as the United States claims, the Tribe's treaty rights have been abrogated at any time since 1858; if not, *a fortiori*, the Tribe's title has not been extinguished.[9]

■ Congress has the absolute right to abrogate Indian treaty rights. *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566–68, 23 S.Ct. 216, 221–22, 47 L.Ed. 299 (1903). It is settled that such rights may be abrogated by "treaty, by the sword, by purchase, [or] by the exercise of complete dominion adverse to the right of occupancy...." *Santa Fe Pacific, supra,* 314 U.S. at 347, 62 S.Ct. at 252, *quoting Beecher v. Wetherby*, 95 U.S. (5 Otto) 517, 525, 24 L.Ed. 440 (1877). In the instant case, the United States relies entirely on the phrase, "the exercise of complete dominion" to support its position. Courts have emphatically ruled, however, that no matter the method employed to abrogate treaty rights, Indian title cannot be extinguished absent a plain and unambiguous expression by Congress of its intent to do so. *Santa Fe Pacific, supra,* 314 U.S. at 353–54. This circuit has adamantly followed that rule. *See United States v. Winnebago Tribe of Nebraska*, 542 F.2d 1002, 1005 (8th Cir.1976).

■ To determine whether Congress has manifested such an intent, courts customarily look first to determine whether treaty rights have been abrogated by statute.[10] The case at bar, however, is not a question of statutory abrogation of treaty rights. The United States does not allege any statutory abrogation. The government argues only that the Tribe's title was extinguished through the establishment, enlargement and administration of the Lake Andes Wildlife Refuge, pursuant to an ex-

---

**9.** This is not, of course, to elevate the quality of recognized title above that of aboriginal title except in one respect: a taking of recognized title is compensable, while a taking of aboriginal title is not. *See Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed.

314 (1955); *United States v. Creek Nation,* 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935).

**10.** *See United States v. Dion,* 752 F.2d 1261 (8th Cir.1985).

ecutive order, and by virtue of the government's continuous, exclusive possession and control of the bed of Lake Andes. *See* Memorandum of the United States In Support of Its Motion for Summary Judgment at 7.

In the instant case, the United States relies on *United States v. Gemmill,* 535 F.2d 1145 (9th Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976), which established that the inclusion of aboriginal lands within a national forest may extinguish aboriginal title. In *Dann II* the Ninth Circuit distinguished its earlier decision in *Gemmill,* however, noting that in *Gemmill* the Indians had been forcibly removed from the lands in question over 100 years before the decision, and that the forcible removal was a critical factor in the court's decision. *Dann II, supra,* 706 F.2d at 932–33.

In the instant case, the United States alleges neither a forcible removal of the Tribe, nor any act of Congress which would indicate intent to abrogate the Tribe's treaty rights. This Court must therefore look for some other clear and unambiguous expression of congressional intent to abrogate Indian title, particularly in light of the United States' trust responsibility toward the Tribe. There simply is no such clear and unambiguous expression of intent in this case.

The authority is clear. Abandonment, even if it can be shown, does not extinguish Indian title absent the express intent of Congress. The Tribe holds aboriginal title to Lake Andes, and its aboriginal title was recognized by the Treaty of 1858. Since 1858, Congress has not clearly and unambiguously manifested an intent to abrogate the Tribe's treaty rights, and it follows that the Tribe's recognized title to the bed of Lake Andes has not been extinguished. The United States' abandonment argument must fail, and the Tribe must prevail on its motion for summary judgment.

11. The only issue raised by the Rule 59(e) motion of the State and County presently before

*United States' motion for leave to supplement the record*

In view of the Court's finding that the United States is barred from relitigating the issues of aboriginal title and the Cession Agreement of 1892 by the doctrine of mutual defensive collateral estoppel, and alternatively because the United States, as an intervenor, has no right to relitigate matters already determined in the case, no purpose would be served by allowing the United States to supplement the record as to those issues. To allow the introduction of further evidence in the face of an absolute legal bar would be an unconscionable waste of judicial time and resources.

As to the abandonment issue, the United States wishes to introduce evidence pertaining to whether the Tribe voluntarily abandoned the lake either subsequent to the 1892 Cession Agreement, or when the wildlife refuge was established in the 1930's. The Court has found, however, that even assuming arguendo the United States can establish the factual basis, its claim fails as a matter of law, because abandonment does not extinguish Indian title absent the express intent of Congress to abrogate the Tribe's treaty rights. Ergo, permitting the United States to supplement the record as requested would be an empty and futile gesture, and further extend this seemingly interminable litigation. There is absolutely no legal basis for the Court to do so.

### CLAIMS OF THE STATE AND COUNTY

The State and County move for summary judgment for the purpose of seeking reconsideration of the Court's earlier disposition of the equal footing doctrine and 1892 Cession Agreement issues. *See* Memorandum of the State of South Dakota and Charles Mix County for Support of Cross Motion For Summary Judgment at 2. The Tribe argues that the State and County are bound by the 1981 Decision against them, and that absent a timely motion to amend,[11]

the Court is the location of the lakebed boundary.

the State and County cannot seek to relitigate any issues.

The State and County concede the absence of such a timely motion, but contend that this lawsuit was reopened for further litigation by all the parties when the Court established a schedule for the filing of summary judgment motions by the Tribe and the United States. The United States, they argue, was bound by the August 5, 1983 judgment when it intervened in the case, just as were the other parties; therefore, permitting the United States and the Tribe to litigate issues raised in the complaint in intervention could only mean that the Court intended the prior judgment to be set aside. I find, however, that the August 5, 1983 judgment binds the State and County, and that the judgment has not been set aside.

The arguments of the State and County are made *ipse dixit*, except for the proposition that an intervenor is bound by all prior orders and adjudications in the lawsuit. *See Galbreath v. Metropolitan Trust Co. of Calif.*, 134 F.2d 569 (10th Cir.1943). The Court accepts that general principle of law, as restated by the Supreme Court in *Arizona v. California, supra*, 103 S.Ct. at 1389. But as noted above, Justice Rehnquist, writing for the Court in *Arizona v. California*, was very specific that the bar on relitigation applies only to matters already determined in the case, and on that basis I have already found that the United States is barred from relitigating two such issues.

■■■ The United States' claim of abandonment subsequent to 1858, however, had not been previously litigated in this action, and an intervenor is certainly not barred from raising new issues in a complaint in intervention. If that were the case, an interested party would never seek to intervene after a judgment, nor, for that matter, would post-judgment intervention ever be permitted. Therefore, because it is well settled that intervention after entry of judgment is proper in some situations, *Nevilles v. Equal Employment Opportunity Com'n.*, 511 F.2d 303, 305 (8th Cir.1975), it follows that an intervenor is not bound by a prior judgment in the literal sense of res judicata. This interpretation also comports with the 1966 Amendment to Federal Rule of Civil Procedure 24. *See also Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 541 (8th Cir.1970).

■■■ I conclude that the post-judgment intervention of the United States and the Court's subsequent actions in scheduling motions for summary judgment to be filed by the Tribe and the United States did not have the effect of setting aside the August 5, 1983 judgment and reopening the case for further litigation.

■■■ Moreover, even if I were to find that the judgment had been set aside (which I expressly decline to do), I would find that the law of the case doctrine serves to bar the State and County from relitigating issues previously decided in the case. A prior decision in a case is the "law of the case" in all subsequent proceedings unless:

(1) The evidence sought to be introduced in the subsequent proceeding is substantially different from that first considered by the court, or

(2) The prior decision is clearly erroneous and works manifest injustice.

*Continental Bank & Trust Co. v. American Bonding*, 630 F.2d 606, 608 (8th Cir. 1980). While this rule of practice is not a limit of power, it is nevertheless a salutary one, and must be followed in both district and appellate courts. *Id.*

■■■ The State and County claim to be seeking reconsideration of the equal footing doctrine and 1892 Cession Agreement issues on the basis of "new matters", thereby satisfying the first prong of the *Continental Bank & Trust Co.* test. In fact, however, they cite no significantly new or different legal authority, and make no new legal arguments. Neither do they seek to introduce any "substantially different" evidence. In short, they present the Court with no compelling reason to depart from the law of the case.

Furthermore, the State and County do not contend, nor does the Court find, that

the prior decision in this case is clearly erroneous and works manifest injustice. On the contrary, to needlessly protract this litigation beyond the nearly nine years it has already consumed would be to work manifest injustice. Accordingly, I find that while the case has not been reopened for further litigation, the State and County would in any event be precluded from relitigating the equal footing doctrine and 1892 Cession Agreement issues because the Court's earlier ruling on those issues is the law of the case.

### RULE 59(e) MOTIONS TO AMEND THE JUDGMENT

■ The motion of the Tribe and the joint motion of the State and County to amend the judgment may be considered together. The language in the August 5, 1983 judgment which the parties contend requires clarification is found in the second paragraph, where the Court finds the Tribe to be the owner "of the Lake Andes bed." The issue is the precise location of the lakebed boundary.

The Tribe wishes to define the area of ownership to be "the Lake Andes bed, as meandered by government survey in 1875." The State and County would have the Tribe described as the owner "of that portion of the bed of Lake Andes over which the State of South Dakota has exercised ownership under claim of right."

This disagreement arises late in the litigation, to say the least. From the outset, both sides have referred to the meander line surveyed in 1875 in pleadings and briefs, and both have relied upon its accuracy. In the usual quiet title action, of course, the boundaries of the property in question are determined by the description in the complaint. This lawsuit, however, began as a trespass action, and the property was only generally described until the Tribe filed its motion for summary judgment, in which the lakebed was described as having dimensions of eight miles by one and one-half miles, determined by the official government survey. In addition, the Tribe attached to its motion a plat map showing the 1875 meander line.

The Tribe argues that establishing the meander line as the boundary is the proper resolution of the question both as a matter of law, and as a practical matter. It is the Tribe's position that reliance on the meander line provides a clear and ascertainable boundary which will not implicate the property rights of non-parties. I agree.

The language proposed by the State and County is so obscure that it would almost certainly engender further litigation if it were incorporated into the judgment. Neither the parties nor the adjoining landowners have any way to determine with certainty which portion of the lakebed was historically subject to the State's claim of right. To adopt it would therefore result in the exact situation the State and County seek to avoid—riparian landowners could point to no definite boundary separating their property from the Tribe's property.

The Tribe's proposed amendment, on the other hand, does nothing more than incorporate the language of the pleadings into the express language of the judgment, yielding a result similar to that of a more routine quiet title action. Furthermore, establishing the meander line as a boundary has the advantage of certainty for parties and non-parties alike.

However, the Court is mindful of the argument made by the United States, that the meander line is merely a representation of the ordinary high water mark at the time of the survey, and not a fixed boundary. The United States cites *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973), for the "usual rule" of riparian ownership, that the boundary of the property riparian to a navigable body of water is subject to loss or gain as the water boundary changes. The Court rejects this authority, however, in view of the fact that *Bonelli* was expressly overruled by the Supreme Court in *Oregon v. Corvallis Sand. & Gravel Co.*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977).

Moreover, there is nothing "usual" about the instant case. Allowing riparian landowners to exercise ownership of all the

land to the water's edge would effectively destroy the Tribe's ownership of the bed in dry years. This case is therefore analogous to those cases in which a substantial amount of land is formed by accretion between the meander line and the water. Faced with such facts, courts have not hesitated to fix the meander line as the boundary, which is the only equitable solution. *See DeBoer v. United States*, 653 F.2d 1313, 1315 (9th Cir.1981), and cases cited therein. Also analogous is the equitable principle that land is equally subject to loss by erosion as it is to gain. *See Hughes v. Washington*, 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967).

In the instant case, consideration of the equities compels the same result as in those cases where land is formed by accretion below the meander line. It would unjustly enrich the landowners adjoining Lake Andes to hold that their property, in dry years, extends to the water's edge. The result would be that in years when the lakebed was completely dry, as it was when this litigation began, the Tribe would own nothing. I refuse to accept such an inequitable outcome. The meander line is the logical, natural and equitable boundary of the lakebed.

The Tribe's proposed amendment is accepted, the State and County's is rejected. The phrase "the Lake Andes bed, as meandered by government survey in 1875" will be substituted for the phrase "of the Lake Andes bed" in the August 5, 1983 judgment.

### SUMMARY

This case is now nearly nine years old. Although remanded for a simple factual determination only, the State, the County and the United States would have this Court discard its prior rulings and reopen every issue for further litigation. Such a sweeping reconsideration of the issues, however, would serve neither the law nor justice. This Court and others have furnished the parties every opportunity to argue and reargue the case. The lawsuit must now, finally, be brought to an end.

The Yankton Sioux Tribe of Indians owns the bed of Lake Andes.

IT IS THEREFORE ORDERED that the United States' Motion for Summary Judgment, the United States' Motion For Leave to Supplement the Record, the State and County's Rule 59(e) Motion to Amend the Judgment, and the State and County's Motion for Summary Judgment are DENIED, and

IT IS FURTHER ORDERED that the Tribe's Motion for Summary Judgment and the Tribe's Rule 59(e) Motion to Amend the Judgment are GRANTED.

This memorandum decision constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. Counsel for the plaintiff Yankton Sioux Tribe of Indians may prepare an appropriate judgment in accordance with this decision.