UNITED STATES of America,
Plaintiff-Appellee,

v.

Arnold GEMMILL et al.,
Defendants-Appellants.

Nos. 74–2809, 74–2965, 74–3062, 75–1019
to 75–1022.

United States Court of Appeals,
Ninth Circuit.

April 22, 1976.

As Amended on Denial of Rehearing and Rehearing En Banc July 20, 1976.

E. Richard Walker (argued), Federal Defenders of Sacramento, Sacramento, Cal., and Aubrey Grossman (argued), San Francisco, Cal., for defendants-appellants.

Donald H. Heller, Asst. U.S. Atty. (argued), Sacramento, Cal., for plaintiff-appellee.

## OPINION

Before CHAMBERS, HUFSTEDLER and SNEED, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Appellant Indians challenge their convictions for theft of government property and for illegal occupancy of a national forest. Their consolidated appeals can be divided into two categories: the timber cases and the trespass cases.

On November 8, 1973, the three appellants[1] in the timber cases cut and carried away Christmas trees from the Shasta Trin-

---

1. Appellants in the timber cases are Ross Montgomery, George Montgomery, and Pete Wilson.

ity National Forest. They claimed authority to do so under an authorization from the Pit River Indian Tribe, of which they are members and which, they contend, has Indian title to the land in question. Appellants were charged under 18 U.S.C. § 641 with theft of government property valued at less than $100. Two of the appellants received the maximum sentence of one year imprisonment and the third, Pete Wilson, was sentenced to an indeterminate term under the Federal Youth Corrections Act, 18 U.S.C. § 5010(b).

The trespass appellants[2] were charged with illegal occupancy of the Lassen National Forest following the issuance of closure orders by the Forest Supervisor. The alleged trespasses occurred in December 1972 and December 1973. In both instances, the reason given for the closure order was to avoid a confrontation between loggers and the Indians. The Indians sought to stop the logging operations on land they considered sacred and to raise their claim of Indian title to the land. The appellants involved in the 1972 trespass were sentenced to the maximum of six months under 7 U.S.C. § 1011(f) and 16 U.S.C. § 551.[3] The 1973 trespass appellants received the same sentence under 18 U.S.C. § 1863,[4] except for Arnold Gemmill who was sentenced to an indeterminate term under the Federal Youth Corrections Act.

In both the timber and the trespass cases the appellants claim that the Pit River Indian Tribe has Indian title to the land on which the violations occurred. In the timber cases they also contend that they were prosecuted under the wrong statute and that imposing the maximum sentences was an abuse of discretion. The appellants in the trespass cases contest the authority of a Forest Supervisor to issue closure orders and claim that they were deprived of their constitutional rights under the First and Sixth Amendments. We affirm the convictions in the timber cases and reverse in the trespass cases.

## I. The Claim of Indian Title.

■ Indian title is a permissive right of occupancy granted by the federal government to the aboriginal possessors of the land. (*Johnson v. McIntosh* (1823) 21 U.S. (8 Wheat.) 543, 573–74, 5 L.Ed. 681, 688 (Marshall, C. J.).) It is "mere possession not specifically recognized as ownership" (*Tee-Hit-Ton Indians v. United States* (1955) 348 U.S. 272, 279, 75 S.Ct. 313, 317, 99 L.Ed. 314, 320) and may be extinguished by the federal government at any time. Although an "extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards" (*United States v. Santa Fe Pacific R. Co.* (1941) 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260, 274), when the Government clearly intends to extinguish Indian title the courts will not inquire into the means or propriety of the action:

"Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme. The manner, method and time of such extinguishment raise political not justiciable issues. As stated by Chief Justice Marshall in *Johnson v. M'Intosh,* 'the exclusive right of the United States to extinguish' Indian title has never been doubted. And whether it be done by treaty, by the

---

**2.** Appellants in the 1972 trespass cases are Talbert Wilson, Ross Montgomery, and Phillip Courts. The 1973 trespass appellants are Ross Montgomery, George Montgomery, Lilian Montgomery, Mary Jane Montgomery, and Arnold Gemmill.

**3.** Section 1011(f) of 7 U.S.C. empowers the Secretary of Agriculture to promulgate regulations for the use and occupancy of property administered by the Department of Agriculture and provides for a maximum penalty of six months imprisonment and/or a $500 fine for violations of the regulations. Section 551 of 16 U.S.C. grants the Secretary the authority to make regulations pertaining to national forests and establishes the same penalties. In all of the trespass cases the regulation at issue is 36 C.F.R. § 251.25. (*See* Part III, *infra.*)

**4.** Section 1863 of 18 U.S.C. prohibits trespass on "national-forest land while it is closed to the public pursuant to lawful regulation of the Secretary of Agriculture." The maximum penalty is six months imprisonment, a $500 fine, or both.

sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts." (*Santa Fe, supra,* at 347, 62 S.Ct. at 252, 86 L.Ed. at 270 (citations omitted).)

Thus, despite "the policy of the Congress, continued throughout our history, to extinguish Indian title through negotiation rather than by force" (*Tee-Hit-Ton Indians, supra,* 348 U.S., at 273, 75 S.Ct. at 314, 99 L.Ed. at 317), extinguishment need not be accomplished by treaty or voluntary cession. The relevant question is whether the governmental action was intended to be a revocation of Indian occupancy rights, not whether the revocation was effected by permissible means.

■ There is no dispute in this case that prior to 1850 the Pit River Indians held Indian title to the lands in question; the issue is whether that title has been extinguished. Appellants argue vigorously that the California Land Claims Act of 1851 (Act of March 3, 1851, ch. 41, 9 Stat. 631) did not revoke their rights in the land. The Act required that "every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government" present that claim to a special Commission. (*Id.* § 8.) Confirmed claims were perfected by the issuance of a patent; land that was not patented within two years passed into the public domain of the United States. (*Id.* § 13.) In *Barker v. Harvey* (1901) 181 U.S. 481, 21 S.Ct. 690, 45 L.Ed. 963 and *United States v. Title Ins. & Trust Co.* (1924) 265 U.S. 472, 44 S.Ct. 621, 68 L.Ed. 1110, the Supreme Court upheld fee titles based on patents against challenges by Mission Indians who had not presented their claims to the 1851 Commission.

■ Appellants here claim that the Act, as construed in *Barker* and *Title Insurance,* covered only claims of fee ownership or claims of lesser property interests based on explicit or implicit grants from the Spanish and Mexican governments. Since their claim of Indian title is not one of ownership

derived from a foreign government, but is a claim of permissive occupancy based on the acquiescence of the United States sovereign, appellants argue that the actions of the 1851 Commission did not affect their rights in the land. The contention that the Pit River Indian title was not extinguished by the 1851 Act finds some support in *Barker* and in legislation enacted after the expiration of the 1851 Act. (*See Barker, supra,* 181 U.S., at 491–92, 21 S.Ct. at 694, 45 L.Ed. at 968 (noting an "essential difference" between temporary Indian occupancy and a right of permanent occupancy based on action of a prior government); Act of March 3, 1853, ch. 145, § 6, 10 Stat. 244, 246–47 (limiting post-1853 settlement on land occupied or possessed by any Indian tribe).)

Nevertheless, even if we agree, *arguendo,* that the 1851 Act was ambiguous as to the extinguishment of Indian title, a series of federal actions subsequent to 1851 clearly demonstrates that the Pit River Indian title has been extinguished. First, in the 1850's and the 1860's the Government undertook concentrated military action against the Pit River Indians and other tribes in the area. In 1857, Fort Crook was established as a base of military operations and in 1867 the various tribes were "decisively overcome" at the Battle of the Infernal Caverns. (*Pit River Indians v. United States* (1959) 7 Ind. Cl.Comm 815, 862.) Conceding that they have not been in physical possession of the land for 100 years, the Indians contend that their title survived because they were removed by force, rather than by voluntary abandonment. An extinguishment by force, however, is effective (*Santa Fe, supra,* 314 U.S. at 347, 62 S.Ct. at 252, 86 L.Ed. at 270) and the military action of the mid-nineteenth century is a strong indication of the sovereign's intent to revoke the Pit River rights of permissive occupancy.

In the beginning of the twentieth century, the United States took action that further clarified the status of the land. At trial the Government introduced uncontroverted documentary evidence from the Bureau of Land Management showing that in

the early 1900's the claimed land was included in national forest reserves which later became the Shasta Trinity and Lassen National Forests. The continuous use of the land to the present time for the purposes of conservation and recreation, after the Indians had been forcibly expelled, leaves little doubt that Indian title was extinguished. The Court of Claims has recently held that the designation of land as a forest reserve is itself effective to extinguish Indian title. (*United States v. Pueblo of San Ildefonso* (Ct.Cl.1975) 513 F.2d 1383, 1386, 1391–92.)

Finally, any ambiguity about extinguishment that may have remained after the establishment of the forest reserves, has been decisively resolved by congressional payment of compensation to the Pit River Indians for these lands. In 1946 Congress established the Indian Claims Commission to hear and determine claims against the United States by groups of American Indians. (25 U.S.C. §§ 70 to 70v–2)[5] The Pit River Indians filed a claim with the Commission to receive compensation for the taking of their Indian title lands. (*Pit River Indians v. United States* (1959) 7 Ind.Cl. Comm. 815.) In 1959, the Commission found that the Pit River Indian title to approximately 3,386,000 acres had been taken by the federal government. (*Id.* at 862.) Five years later, after negotiations and voting by the various tribes, the Commission approved a compromise final settlement between the United States and all the Califor-

nia Indians (including the Pit River Indians) with claims pending before the Commission. (*Thompson v. United States* (1964) 13 Ind.Cl.Comm. 369, 513.)[6] That same year Congress appropriated the funds to pay the settlement. (Act of October 7, 1964, Pub.L. No. 88–635, ch. 11, 78 Stat. 1033; *Andrade v. United States* (1973) 485 F.2d 660, 661, 202 Ct.Cl. 988.) Payment of the Pit River claim eliminates any lingering doubt that by 1964 Congress had revoked the Indians' rights of permissive occupancy.

The exact date on which Indian title has been extinguished is often difficult to determine. (*See United States v. Pueblo of San Ildefonso, supra,* at 1391.) The four events we have recounted amply illustrate that problem. Any one of these actions, examined in isolation, may not provide an unequivocal answer to the question of extinguishment. However, the activity of the federal government, beginning with the ambiguous Act of 1851 and culminating in the payment of the compromise settlement, has included expulsion by force, inconsistent use, and voluntary payment of compensation agreement. (*See Santa Fe, supra,* 314 U.S. at 347, 62 S.Ct. at 252, 86 L.Ed. at 270.) This century-long course of conduct amply demonstrates that the Pit River Indian title has been extinguished.

## II. The Timber Cases.

As an alternative to the Indian title defense, the timber appellants contend that

---

**5.** The Indian Claims Commission Act required the Commission that notify all groups of Indians in the United States of the procedure for bringing claims. (25 U.S.C. § 70*l.*) Final determinations of the Commission are appealable, within three months, to the Court of Claims and then to the Supreme Court. (*Id.* § 70s.) After proceedings on a claim have been terminated, the Commission is required to report the final determination to Congress, and Congress is authorized to appropriate the amount awarded. (*Id.* §§ 70t, 70u(a).)

In *Otoe Missouria Tribe of Indians v. United States* (1955) 131 F.Supp. 265, 285, 131 Ct.Cl. 593, the Court of Claims held that the Act authorized claims based on Indian title.

**6.** Prior to the Commission's approval of the settlement, the Pit River Indians unsuccessfully

attempted to withdraw the tribe from the agreement, and in 1973 they appealed the Claims Commission decision to the Court of Claims. (*Andrade v. United States* (1973), 485 F.2d 660, 202 Ct.Cl. 988.) The court held that the suit was barred by the statute of limitations and by laches because of an unexcused eight-year delay. *Id.* at 664–65. The Indians challenged the procedures by which the settlement was presented to the tribe for voting and claimed that their counsel had not adequately represented their interests. At no time, either before the Commission or in the Court of Claims, did the Pit River Indians dispute the Commission's finding that their title had been extinguished. Their compensation claim was, of course, premised upon an extinguishment.

they cannot be convicted under 18 U.S.C. § 641, but only under 18 U.S.C. §§ 1852, 1853. Section 641 is a general statute covering theft of government property; sections 1852 and 1853 specifically prohibit cutting, removing, injuring, or destroying timber on public and other government lands.

At common law, growing trees were considered to be real, rather than personal property (5 American Law of Property § 19.15 (A. J. Casner ed. 1952)), and thus not the subject of larceny until severed from the land. (52A C.J.S. *Larceny* § 3(3)a(b)–(c) (1968).) If severance was effected by natural causes, or by someone other than the thief, the timber became personal property and asportation by the thief constituted larceny. When the thief himself cut the trees, the line between larceny and simple trespass on real property was drawn on the basis of whether severance and asportation were separate and independent acts or different parts of a continuous act. If the latter, there was no larceny because the trees retained their character as realty. (*Id.; cf. United States v. Wagner* (C.C.D.C.1806) 28 F.Cas. 386 (No. 16,630) (severance and carrying away of fence rails in one continued act constitutes trespass).) Not surprisingly, this distinction "has been criticized as subtle and illogical." (52A C.J.S., *supra*.)

Counsel for appellants seems to argue that the cutting and taking of the trees were one continuous act, that unless altered by statute the common law defines the offense as trespass, that sections 1852 and 1853, but not section 641, changed the common law rule, and that therefore appellants could only be prosecuted under sections 1852 and 1853, or, presumably, a trespass statute.

We have previously rejected the argument that severance and asportation can be merged to convert theft into trespass and thereby foreclose prosecution under section 641. Although *Magnolia Motor & Logging Co. v. United States* (9th Cir. 1959) 264 F.2d 950, paid lip service to the common-law doctrine in finding distinct acts (*id.* at 954),

our opinion in *United States v. Cedar* (9th Cir. 1971) 437 F.2d 1033, excluded the possibility of there being only one continuous act in a timber theft situation. The defendant there cut and removed Christmas trees and was convicted of unlawful cutting (§ 1853) and theft (§ 641). On appeal he claimed that the sentences should run concurrently since the one crime merged into the other. We rejected his claim and held that the two statutes serve distinct public purposes and create separate offenses: cutting and theft. (*Id.* at 1036.)

The appellants in this case not only cut the trees but also carried them away. The latter act is a separate offense under section 641.

■ The final contention of the appellants in the timber cases is that the trial judge abused his discretion in imposing the maximum period of confinement for each of the adult offenders and in sentencing Wilson under the Federal Youth Corrections Act. An appellate court will not normally review sentences. (*United States v. Stockwell* (9th Cir. 1973) 472 F.2d 1186, 1187; *Gollaher v. United States* (9th Cir. 1969) 419 F.2d 520, 530.) The sentences of the adult offenders were within the statutory range of penalties, and the trial court provided for concurrent rather than consecutive sentences for both appellants. No fine was imposed, although section 641 authorizes a fine of up to $1000. The district court found that Wilson was 19 years of age at the time of conviction and suitable for sentencing under the Federal Youth Corrections Act. (*Cf. Dorszynski v. United States* (1974) 418 U.S. 424, 442–45, 94 S.Ct. 3042, 3052, 41 L.Ed.2d 855, 867.) Although the sentences might be considered severe under the circumstances of these cases, they are within the limits of discretion committed to the district court.

## III. The Trespass Cases.

■ The defendants in the trespass cases contend that the closure orders, the violation of which constituted the trespass,

were invalid because a Forest Supervisor has no authority to issue such orders. The Government relies on 36 C.F.R. § 251.25 [7] to establish the Supervisor's authority:

"Occupancy and use of national forest land shall be permitted only upon compliance with reasonable conditions for the protection and administration of the national forests and resources and the promotion of public health, welfare, safety, or convenience. Public notices shall be posted by the Forest Supervisor in such locations as will reasonably bring them to the attention of the public, setting forth such conditions with respect to any areas on which special restrictions should be imposed. A copy of the conditions shall be kept available to the public in the offices of the Ranger and Supervisor."

On its face, section 251.25 neither confirms nor denies the authority of a Forest Supervisor to issue closure orders.

Other Forest Service regulations promulgated by the Secretary of Agriculture, however, clearly indicate that only the most limited closure power has been delegated to Supervisors. The regulations include express authorization for seven different types of closure. In all but one instance, the closure authority is specifically granted to the Chief of the Forest Service or to the Regional Foresters.[8] None of the closure regulations provides for a further delegation of the authority. Thus, the Chief is authorized to "close roads . . . to all vehicle use or to use by certain classes of vehicles." (§ 212.7(a)(3)); and to close areas (1) for the protection of rare species, special biological communities, and historical or archeological places of interest and (2) for scientific experiments or other purposes requiring controlled use (§ 261.11(i)).

The Regional Foresters have the authority to close or otherwise restrict use of areas because of fire hazards (§ 261.-2(e)(h)(i)(k)(m)(n)); to close areas to cross-country vehicular travel (§ 261.4(i)); to close areas because of dangers from infectious animal diseases (§ 261.11(f)); and to close any area to prevent destruction to property (§ 261.11(k)).

The only exception to the specificity with which the Secretary has assigned the closure power is a 1973 amendment to the regulations which prohibits:

"Entering or using a site or a portion of a site closed to public use. Notices establishing closure shall be posed [sic] in such location as will reasonably bring them to the attention of the public." (§ 291.7(b).)

Even if we assume that this prohibition impliedly authorizes a Supervisor to order site closure, the power is limited. It is applicable only to recreation sites and areas of concentrated use (§ 291.2(a)–(d)), and is, therefore, consistent with the careful division of authority established by the other closure regulations.

In light of the Secretary's detailed delegation of the closure power, section 251.25 must be narrowly construed. The section is a grant of residual authority to assure that officials in the Forest Service bureaucracy can effectively perform the functions assigned to them. It fulfills its purpose and is easily reconciled with the other regulations if the scope of the authority it grants to Forest Supervisors is limited to actions and areas of concern assigned to them elsewhere in the regulations. Because only the most limited closure power is even arguably within the range of authority given to Forest Supervisors, section 251.25 cannot be

---

**7.** All citations to the Code of Federal Regulations are to Title 36, 1973 edition.

**8.** The Secretary of Agriculture has established and delegated authority to the Forest Service as the agency charged with the administration of National Forests and other conservation areas. The Forest Service bureaucracy is headed by the Chief and his staff in the central office.

(§ 200.1(a)–(b).) The field organization of the Service is divided into nine geographic regions, each supervised by a Regional Forester responsible to the Chief (§ 200.2(a)), subdivided into National Forests supervised by a Forest Supervisor (§ 200.2(a)(1)), and further subdivided into ranger districts supervised by a District Ranger (§ 200.2(a)(2)).

construed as a broad, implicit grant of power to close large areas of a national forest. Absent an explicit delegation from the Secretary, the boundaries of the Forest Supervisors' authority should not be extended into areas the regulations have clearly reserved for higher officials.[9]

Our construction of section 251.25 should not hinder the Forest Service's effective administration of national forests. In these trespass cases, the Supervisor could have posted restrictions against interfering with lawful logging operations, thus creating a violation for interference, but not for mere entry into the logging area. If the restriction proved ineffective, the Supervisor could have notified the Regional Forester and requested that a closure order be issued.

By immediately closing the entire area, the Supervisor went beyond the limits of his authority and exercised a power that had not been granted to him. The closure orders were invalid and the trespass convictions cannot stand. Because of our view that the Forest Supervisor had no authority to issue the closure orders, we do not reach the appellants' First and Sixth Amendment claims.

The theft convictions are affirmed and the trespass convictions are reversed.

---

**9.** Had the Secretary of Agriculture sought to extend the closure power to Forest Supervisors he could have followed the example of the Secretary of Interior's provision for national parks:

"The Superintendent may . . . close or restrict the public use of all or any portion of a park area, when necessary for the protection of the area or the safety and welfare of persons or property. . . ." (36 C.F.R. § 2.6.)