# State of Vermont v. Raleigh Elliott, et al.

[616 A.2d 210]

No. 90-512

Present: **Allen, C.J., Gibson and Morse, JJ., and Barney, C.J. (Ret.) and Peck, J. (Ret.), Specially Assigned**

Opinion Filed June 12, 1992

Motion for Reargument Denied August 25, 1992

*Jeffrey L. Amestoy,* Attorney General, *William E. Griffin,* Chief Assistant Attorney General, and *Susan R. Harritt* and *Andrew M. Eschen,* Assistant Attorneys General, Montpelier, for Plaintiff-Appellant.

*Gabor Rona* of *Rubin, Rona, Kidney & Myer,* Barre, and *Neil Mickenberg* of *Mickenberg, Dunn, Sirotkin & Dorsch,* Burlington, for Defendants-Appellees.

**Morse, J.** Defendants are individuals in a group of thirty-six people who were charged with fishing without a license under 10 V.S.A. §§ 4251(a), 4266. The cases arose primarily from an October 18, 1987 "fish-in" demonstration and were consolidated for trial. Before trial, defendants moved to dismiss based on the doctrine of "aboriginal rights." They claimed the doctrine prohibited the prosecution of Native Americans if they were members of a currently viable Indian tribe which had from "time immemorial" continuously occupied the land where the offenses occurred. According to defendants, because they held "aboriginal title" to the land, they were not subject to state regulation for fishing without a license.[1]

The trial court agreed and dismissed the charges against most of the defendants because they were members of the Missisquoi Tribe, a subpart of the Western Abenaki Tribe whose aboriginal title had not been extinguished. The State took an interlocutory appeal, arguing that the Abenakis (as we shall refer to them for purposes of this opinion) are no longer a tribe, and, even if they are, any aboriginal title to the land was extinguished by governmental action long ago. We agree that aboriginal rights were extinguished and, accordingly, reverse.

---

[1] Defendants' position might have been based on the exception to state fishing licensing requirements under 10 V.S.A. § 4253(a), allowing a person to fish without a license on land owned by the person. The court ruled, however, on a broader basis that the state's regulation of fishing impermissibly infringed on aboriginal rights. The State did not challenge the court's holding in this respect except on the ground that aboriginal rights did not exist. We therefore express no opinion on whether the state may regulate lands subject to aboriginal title.

## I.

■■■■ "Aboriginal title" gives members of a viable Native American[2] tribe a right of occupancy to lands that is protected against claims by anyone else unless the tribe abandons the lands or the sovereign extinguishes the right. *United States v. Santa Fe Pacific R.R.*, 314 U.S. 339, 345–47 (1941). The right arises from a tribe's occupation of a definable, ancestral homeland before the onset of European colonization. The occupation must have been exclusive of the occupation by other tribes. *Id.* at 345. The validity of aboriginal title is not dependent on treaty, statute, or other formal governmental recognition, *Cramer v. United States*, 261 U.S. 219, 229 (1923), but a group making a claim under the doctrine must present sufficient proof that they have constituted a tribe throughout relevant history and have never voluntarily abandoned their tribal status. *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 586–87 (1st Cir. 1979).

This property concept flowed from the "doctrine of discovery," which in turn, derived from natural law. See F. Cohen, *Handbook of Federal Indian Law* 486 n.128 (1982). The discovery doctrine was recognized by European countries during the colonization of North America. During the territorial expansion of the sixteenth, seventeenth, and eighteenth centuries, European governments reconciled their claims to newly acquired lands with claims of other European governments and the aboriginals who were already occupying the lands. *Id.* at 486–87. As a result of these compromises, it was generally understood that a discovering nation—the European government whose arrival was first in time—held title to lands "subject to the Indians' right of occupancy and use." *Id.*; *County of Oneida v. Oneida Indian Nation of New York*, 470 U.S. 226, 234 (1985) [*Oneida I*]; see also Norgren, *Protection of What Rights They Have: Original Principles of Federal Indian Law*, 64 N.D.L.

---

[2] We recognize the controversy surrounding terminology used to identify the original occupants of this country. With all due respect to this issue, we refer to these individuals as Native Americans throughout much of this opinion, but because many of the cases with which we deal use the term "Indians," we will, for the sake of clarity, occasionally use that term to denote "Native Americans."

Rev. 73, 75–87 (1988). Hence, the phrase "aboriginal title" or "Indian title" describes the ownership interest retained by Native Americans in lands which European nations appropriated. *Id.* at 75–78.

The United States Supreme Court adopted the doctrine in *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 592 (1823). In that case and later, the Court applied the doctrine by "assigning dual, or split, property rights to the discoverer nation on the one hand, and Indian nations on the other." Norgren, *supra*, at 85. As caselaw developed, it became clear that discovering nations did not hold fee simple absolute because their interest was encumbered by the occupancy rights held by Native Americans. *Mitchel v. United States*, 34 U.S. (9 Pet.) 711, 758 (1835). The interest that the discovering nation did hold, however, significantly impaired the rights of the original inhabitants because the discoverer had the "'exclusive right . . . to appropriate the lands occupied by the Indians,'" Norgren, *supra*, at 90 (quoting *Johnson*, 21 U.S. at 584), and could terminate aboriginal rights at any time. *Santa Fe*, 314 U.S. at 347.

■■ Although the doctrine of aboriginal rights is long standing, *Oneida I*, 470 U.S. at 234, the nature of the various interests in aboriginal lands has not been easily defined or applied. A sovereign's transfer of such land is subject to continuing Indian rights of occupancy and use, until those underlying rights are extinguished. Cohen, *supra*, at 489. The interest transferred is termed the "naked fee." *Id.* Absolute ownership does not vest until Indian title is extinguished, a phenomenon that cannot occur without the act or consent of the sovereign. *Id.* at 487. Therefore, where the terms of a land grant do not rise to the level of extinguishment, or where there has been no action by the sovereign demonstrating an intent to extinguish, the grant of land conveys only an inchoate interest in the land. *United States v. Cook*, 86 U.S. (19 Wall.) 591, 594 (1873) (analogizing Indian title to the interest held by a tenant for life, stating that "[w]hat a tenant for life may do upon the lands of a remainder-man the Indians may do upon their reservations, but no more").

## II.

■ Indian title may be abolished, or "extinguished," caus-

ing the Native Americans to lose their right of occupancy and use, and vesting fee simple absolute in either the sovereign or a third party. *Johnson*, 21 U.S. at 592. Extinguishment differs from a transfer of the naked fee, because when the former occurs, no rights are left in the Indians. Extinguishment may be accomplished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." *Santa Fe*, 314 U.S. at 347.

Even though aboriginal title has been deemed "as sacred as the fee simple of the whites," *Mitchel*, 34 U.S. at 746, it may nevertheless be taken without compensation. *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955). The federal policy is that extinguishment occur through negotiation rather than by force, but an extinguishment by force is valid. See *United States v. Gemmill*, 535 F.2d 1145, 1148 (9th Cir. 1976) (extinguishment need not be accomplished by treaty or voluntary cession because the "relevant question is whether the governmental action was intended to be a revocation of Indian occupancy rights, not whether the revocation was effected by permissible means"). The manner, time, and conditions of extinguishment are determined by the sovereign. *Buttz v. Northern Pacific R.R.*, 119 U.S. 55, 66 (1886). Extinguishment is irrevocable; once it takes place, Indian title cannot be revived.[3]

Before the American Revolution, Great Britain held the power to extinguish aboriginal rights in the colonies. *Oneida Indian Nation of New York v. New York*, 860 F.2d 1145, 1150 (2d Cir. 1988) [*Oneida II*]. The right to extinguish may pass to succeeding sovereigns, and with the adoption of the federal constitution, the right to extinguish became the exclusive right of the federal government. *Santa Fe*, 314 U.S. at 347. Sovereign

---

[3] Observers have regarded the rule of law permitting extinguishment of aboriginal rights with skepticism. In legal discourse the act of extinguishment requires no standard to justify it, and methods used to extinguish aboriginal rights are not justiciable. *Santa Fe*, 314 U.S. at 347 ("justness [of extinguishment] is not open to inquiry in the courts"); *Buttz v. Northern Pacific R.R.*, 119 U.S. at 66 (same); see Norgren, *supra*, at 90–91 (criticizing early caselaw for "[u]sing legal concepts alien to tribal law" to build "a theory of land title sympathetic to the interest of the Republic" and for creating a "muddle of possessory rights versus ultimate property rights").

intent to extinguish need not be express, but there must be evidence that demonstrates a "plain and unambiguous" intent to extinguish exclusive aboriginal rights. *Oneida I*, 470 U.S. at 248. Because of the federal policy to respect Indian rights of occupancy, the intent to extinguish Indian title will not be "'lightly implied.'" *Id.* at 247–48 (quoting *Santa Fe*, 314 U.S. at 346).

An historical event, although insufficient by itself to establish an extinguishment, may contribute to a finding of extinguishment when analyzed together with other events. *Gemmill*, 535 F.2d at 1148 (ambiguity in single act of federal government is not fatal to claim of extinguishment when series of subsequent acts resolves ambiguity to demonstrate extinguishment); *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1391-92 (Ct. Cl. 1975) (inclusion of aboriginal lands in forest reserve and federal grazing district, as well as conveyances made to various grantees at different times, was evidence supporting a finding of extinguishment of Indian title).

Moreover, a century-long course of conduct may demonstrate extinguishment, even though the exact date on which Indian title is extinguished is difficult to determine. *Gemmill*, 535 F.2d at 1149; see also *Ildefonso*, 513 F.2d at 1390 ("there are no fine spun or precise formulas for determining the end of aboriginal ownership").

As seen from our discussion so far, the doctrine of Indian title and its extinguishment lacks precision in delineating between competing interests. See Norgren, *supra*, at 85, 90 (describing the Supreme Court's "lexicon of tribal property rights" both as political "brilliant compromise" and as "judicial mythology" which rationalized the origin of land titles in the United States). Although the doctrine has not been applied in a cohesive manner, "every court considering the doctrine of discovery reaffirmed its basic tenets." Newton, *At the Whim of the Sovereign: Aboriginal Title Reconsidered*, 31 Hastings L.J. 1215, 1226 (1980). The essential test requiring sovereign consent to extinguish aboriginal rights has remained intact since its adoption in *Johnson*. In our analysis, we endeavor to apply these principles.

## III.

During lengthy hearings at the trial level, defendants offered

expert testimony on the origins, duration, and quality of Abenaki presence in the "Missisquoi" area, and on the nature and continuity of tribal status from the beginning of Abenaki presence to date. The State countered that the defendants offered insufficient proof of uninterrupted tribal existence and that, if tribal status did trigger aboriginal rights to the land, those rights had been extinguished.

The court was presented with voluminous evidence on the contested issues, and although we disagree with it in the ultimate outcome, the court's findings and conclusions are indicative of an exhaustive effort to reach a just result in this case. In extensive and meticulous findings, the court described the settlement of Abenakis in northwest Vermont in 9,300 B.C. and occupation of the area as an intact tribe from that date to the present. The court based its findings of tribalness on evidence of Abenaki culture, governance, and familial tradition. According to the court, genealogical, ethnological, and archeological evidence proved uninterrupted tribal presence and ethnic continuity. The court also concluded that the State

> failed to prove by the preponderance of the evidence that the Missisquoi abandoned or ceded their Missisquoi homeland or that their aboriginal rights were extinguished by either an express act or an act clearly and unambiguously implying any sovereign's intent to extinguish those rights. Accordingly, the Missisquoi's aboriginal right to fish in their Missisquoi homeland continues to exist today.

We do not decide whether the trial court ruled correctly on the issue of tribal status and assume for the purposes of this case that defendants are members of a bona fide tribe of Native Americans. We conclude, however, that a series of historical events, beginning with the Wentworth Grants of 1763, and ending with Vermont's admission to the Union in 1791, extinguished the aboriginal rights claimed here.

## IV.

In deciding the issue of extinguishment, we first place the pertinent historical facts in context. Although historical scholarship may be based on conflicting interpretations of recorded history, we briefly recite the political backdrop against which

European settlement was set, in order to put into perspective the events leading to the extinguishment of the Abenakis' aboriginal rights to the land at issue.

## A.

The area covering what is now the states of New York, New Hampshire, and Vermont was colonized in the seventeenth century by European settlers. The English had full control of the New York area by 1669. New Hampshire was also colonized by the English, and was officially under British rule as a royal province by 1679. After the American Revolution, the New York and New Hampshire colonies (also known as provinces) were admitted as two of the thirteen original states in 1788.

The Abenaki occupied what is now northwestern Vermont long before white presence began in the area in 1609 with the arrival of Samuel de Champlain. See 1 W. Crockett, *Vermont: the Green Mountain State* 31–32 (1921); see also generally S. Morison, *Samuel de Champlain, Father of New France* 89–122 (1972). In 1724, Dutch settlers established a community in southern Vermont. After the British won the French and Indian War (1754–63), the land was opened for further European settlement. When the American Revolution began in 1775, approximately 20,000 people lived in what is now the State of Vermont.

## B.

As provinces, New York and New Hampshire were administered on behalf of the Crown by royal governors authorized to grant, "for and in the name of the King, any unchartered lands in [their] province." H. Hall, *Early History of Vermont* 8 (1868). The Crown, however, retained full control over boundaries, and could enlarge or contract them at will. *Id.* The first significant historical event relevant to extinguishment of Abenaki aboriginal title was the royal grant of lands to European settlers in the area claimed by the Abenakis in this case. On August 17, 1763 Royal Governor Benning Wentworth of New Hampshire made land grants in the areas now known as St. Albans, Highgate and Swanton. Continued ownership was conditional: without actual

settlement and cultivation of the lands, title would revert to the British Crown.[4]

During this period, the Crown attempted to maintain peaceful relations with the Indians by issuing a number of orders in the early 1760's designed to avoid conflicts over land between Indians and Europeans. For example, in 1761, the Crown released a "Royal Instruction" to the colonial governors prohibiting them from making grants of land occupied by Indians without specific authority from the Crown, and requiring European settlers to remove themselves from territories not properly obtained.[5] In 1763, the Crown issued a "Royal Proclamation," once again forbidding colonial settlement on Indian-occupied lands and ordering settlers occupying Indian lands to abandon the properties.[6]

---

[4] For example, the Highgate grant, in language common to all three grants, stated

> [t]hat every Grantee, his heirs or Assigns shall plant and cultivate five Acres of Land within the Term of five Years for every fifty Acres contained in his or their Share or Proportion of Land in said Township, and continue to improve and settle the same by additional Cultivations, on Penalty of the Forfeiture of his Grant or Share in the said Township, and of its reverting to Us, our Heirs and Successors, to be by Us or them Regranted to such of our Subjects as shall effectually settle and cultivate the same.

The New Hampshire Grants 221 (A. Batchellor ed. 1895).

[5] The Crown directed royal governors to prosecute settlers who had obtained "any lands within our said province upon pretense of purchases made of the said Indians without a proper license first had and obtained either from us or any of our royal predecessors or any person acting under our authority." Royal Instructions to British Colonial Governors 1760–1776, 477–78 (L. Labaree ed. 1935).

[6] The Royal Proclamation of 1763 provided in relevant part:

> Tribes of Indians . . . should not be . . . disturbed in the Possession of such Parts of our . . . Territories as, not having been ceded to or purchased by Us, are reserved to them, or any of them, as their Hunting Grounds. We do therefore, . . . declare it to be our Royal Will and Pleasure . . . that no Governor . . . in America . . . grant Warrants of Survey, or pass Patents for any Lands . . . or upon any lands whatever, which, not having been ceded to or purchased by Us as aforesaid, are reserved to the said Indians, . . . .
>
> And, We . . . strictly forbid . . . all our loving Subjects from making any Purchases or Settlements whatever, or taking Possession of any of the Lands above reserved, without our especial leave and Licence for that

The Crown was also faced with conflicting land claims among the settlers. New York Governor Cadwallader Colden attempted to grant land that had already been granted by the New Hampshire governor, claiming that Governor Wentworth had no authority to grant lands in the Province of New York.[7] In 1764, the Crown responded to these disputes between the New Hampshire and New York governors by issuing a "Privy Council Order." This order stated that the Connecticut River was the mutual boundary between New York and New Hampshire, thereby clarifying each authority's respective jurisdiction and putting the Wentworth grants in the territory of New York. Ownership quarrels continued, however, and in 1767 the Wentworth grantees petitioned the Crown to halt the regranting of their lands by the New York governor so that their patents could be "ratified and confirmed." 4 *Documentary History of the State of New York* 375–76 (E.B. O'Callaghan ed. 1851). In response, the Crown forbade New York to issue grants "whatever of any Part of the Lands described in the said Report, until his Majesty's further Pleasure shall be known concerning the same." *Id.* at 376. The Crown, however, stayed out of the dispute after issuing this order.

Conflict between New Hampshire claimants and New York authorities persisted. In 1769, the royal government of New York initiated the first in a series of ejectment suits in an attempt to remove the New Hampshire grantees from the land granted by New York. V. Orton, *Personal Observations on the Republic of Vermont* 45 (1977). The New Hampshire grantees subsequently revolted against the New York authorities, and in the years between 1770 and 1775 settlers formed a militia called the "Green Mountain Boys." Led by Ethan Allen, this group of claimants repulsed the "Yorkers" who tried to attain lands in

---

Purpose first obtained.

    And, We do further strictly enjoin and require all Persons whatever who have either wilfully or inadvertently seated themselves upon any Lands, which not having been ceded to or purchased by Us, are still reserved to the said Indians as aforesaid, forthwith to remove themselves from such Settlements.

[7] New York based its jurisdiction over the disputed area on a 1674 grant by King Charles II to the Duke of York, who later became King James II. *Vermont v. New Hampshire*, 289 U.S. 593, 598 (1933).

Vermont. The rebellion prompted the decision to establish an independent government for the New Hampshire grantees. C. Williamson, *Vermont in Quandary: 1763–1825* 7–23 (1949); see also *Vermont v. New Hampshire*, 289 U.S. at 607 (finding of special master that attempts by New York authorities to interfere with holdings of New Hampshire grantees "led to protest and forcible resistance which assumed the proportions of a revolutionary movement").

Consequently, in January 1777, Vermont declared its independence as a "Republic." By this declaration, Vermont rejected all governing authority except its own. The preamble to the document in which Vermont announced its autonomy from New York and British rule, as well as that of the rest of the world, asserted Vermont's dominion over the lands granted by Governor Wentworth:

> And whereas, the territory which now comprehends the State of Vermont, did antecedently, of right, belong to the government of New Hampshire; and the former Governor thereof, viz. his excellency Benning Wentworth, Esq., granted many charters of lands and corporations, within this State, to the present inhabitants and others.

Vt. Const., preamble (1777).

The New Hampshire grantees, now Vermonters, defied any authority that threatened their ownership rights to land in the Republic of Vermont. Ethan Allen's statement to invaders holding "re-granted" New York title to land claimed by the New Hampshire grantees expressed absolute and unyielding defiance. After expelling intruders from New York with the assistance of 300 members of the Green Mountain Boys, Allen challenged the intruders to "[g]o . . . and complain to that damned scoundrel your Governor. God damn your Governor, Laws, King, Council, and Assembly." C. Morrissey, *Vermont: a Bicentennial History* 83 (1981).

Before Vermont's admission to the Union as the fourteenth state, statements made on behalf of the self-proclaimed "Republic" and the federal Congress shed light on the understanding held by both Vermont and Congress as to who had rights to the territory of Vermont. In 1781, during negotiations for admission to the Union, Vermont was called upon to clarify in writing the status of the Wentworth Grants in order to confirm

fulfillment of the settlement conditions. A committee of Congress submitted questions to the Vermont delegates, who explained that none of the grants had been forfeited due to nonsettlement, and that, although settlement had not been completed, they intended to fulfill all the conditions.[8] Hence, the early Vermonters took steps to confirm their entitlement by ensuring fulfillment of the Wentworth conditions.

Vermont's constitution established a single governing body called the "General Assembly" with "exclusive and supreme legislative powers." P. Merrill, *Vermont Under Four Flags: A History of the Green Mountain State 1635–1975*, 21 (1975). In 1783, pursuant to this legislative authority, Vermont set a timetable for settlement previously hindered by the American Revolution. The Legislature provided that May 1, 1784 would be the "lawful Time to begin settlement of New Lands." Act Declaring Time When to Begin Settlement (1783).

Finally, during the admission negotiations, Congress obliged the Vermont authorities to relinquish only those claims covering territory that is now New Hampshire, as opposed to any lands granted by Wentworth in what is now Vermont. Congressional Res. (Aug. 20–21, 1781) ("it [shall] be an indispensable preliminary to the recognition of the independence of the people inhabiting the territory called Vermont, and their admission into the federal union, that they explicitly relinquish all de-

---

[8] 2 Records of the Governor and Council of the State of Vermont, 318–19 (1874) read as follows:

**Query 3d.** What are the ideas of the people of Vermont relative to the claim of private property, under grants or patents from New-Hampshire, or New-York, *previous to the present revolution?*

**Answer.** Altho' the State of Vermont hath not, hitherto, authorized any court to take cognizance of such causes, as respect titles of lands, nevertheless, they have had, and still have it in contemplation to adopt such modes, as the circumstances, arising out of each case, may justify, without adhering to the strict rules of law.

**Query 4th.** What are the intentions of your constituents, in regard to the patents that were granted on conditions of settlement within a given time, and which have been prevented by the claims of the people of Vermont, and the present revolution?

**Answer.** No forfeitures have been taken by the State of Vermont, on any such grant, for non-performance of conditions of settlement, and we conceive it to be the intention of our constituents to grant a further reasonable time for fulfilling such conditions.

mands of lands or jurisdiction on the east side of the west bank of the Connecticut River"). Congressional resolutions recognized that Vermont's northern boundary extended to the forty-fifth degree of northern latitude. *Vermont v. New Hampshire*, 289 U.S. at 610–11. During the last decade of the 1700's, as an additional requirement to federal admission, Vermont paid New York $30,000 "for the relinquishment of all claims of sovereignty by New York, and for the confirmation of the New Hampshire township grants." *Id.* at 611. In 1791, Congress admitted Vermont to the Union on the basis of these boundary delineations. Act Admitting Vermont into the Union (1791); see also *Vermont v. New Hampshire*, 289 U.S. at 613 (delineation of boundary between Vermont and New Hampshire clarified by construing resolution of Congress under which Vermont was admitted to statehood).

## V.

The trial court examined the events leading to Vermont's statehood and concluded that no single event constituted express or implied termination of aboriginal rights. The court declined to decide whether the grants were within Wentworth's geographical jurisdiction, but stated that the New Hampshire Grants were beyond Governor Wentworth's authority as delimited by the Crown's policy to protect the rights of Native Americans. The court cited the Royal Instructions, Proclamations, and other historical evidence in finding that the grants, being inconsistent with the aboriginal right of occupancy, were either invalid, or, in the alternative, conveyed only the "naked fee." The court also stated that Vermont's 1777 Constitution and subsequent admission to the Union did not accomplish an extinguishment of aboriginal rights. As a result, according to the trial court, the State failed to satisfy its burden of showing, by a preponderance of the evidence, a "clear and unambiguous intent to extinguish" aboriginal rights. For the reasons that follow, we disagree.

We differ with the trial court principally in its application of the test for extinguishment to discrete events in Vermont's history, rather than to the cumulative effect of many historical events. The legal standard does not require that extinguishment spring full blown from a single telling event. Extinguishment may be established by the increasing weight of history.

Governor Wentworth's grants of the lands at issue may not have been authorized by the Crown, but any ultra vires exercise of power by him does not detract from the vast political changes it inspired. These grants triggered the emergence of Vermont for a short time in history as an entity separate from the authority of Great Britain and its provinces of New Hampshire and New York, or any other government. A drastic realignment of jurisdictional boundaries was induced by Wentworth's Grants. Appreciation of the various authorities' conduct toward the area that is now the State of Vermont is critical to our determination that intent to extinguish became unquestionable. The Crown's sanctioning of European dominion over the area, the zeal with which the founders of the "Republic" of Vermont protected the New Hampshire Grants, and the negotiations with Congress in anticipation of Vermont joining the Union remove any doubt that extinguishment of Abenaki aboriginal title was complete by 1791, when Vermont became the fourteenth state.

## A.

Defendants rely on the court's finding that the grants were invalid because they violated the Crown's Native American policy, and contend that the New Hampshire governor had no jurisdiction to grant lands in what was then the Province of New York. While the Crown may have declared the grants invalid based on a lack of jurisdictional authority in this particular governor, the sovereign's intent to allow British appropriation of the area was not in question. Despite earlier royal statements, the Crown's conduct sanctioned European appropriation. Indeed, the Crown was given opportunities to prevent European settlement to preserve aboriginal rights during disputes between New York and New Hampshire over the Wentworth Grants. Instead, the Crown maintained the status quo, advancing the interests of European settlement in contravention of its earlier policy statements about preserving Indian occupation.

The Crown's Privy Council Order of 1764 stated that the boundary between New York and New Hampshire was the eastern bank of the Connecticut River. *Vermont v. New Hampshire*, 289 U.S. at 596. Historians interpret this as reflecting the Crown's intent to protect the interest of the New York authorities in the land. H. Hall, *Geography and History of Vermont*

106 (1871). The Crown's mandate giving New York jurisdiction over the grants prompted New York to require the inhabitants to repurchase the land, or risk the prospect of removal by New York authorities. *Id.* Ironically, when the Wentworth grantees complained that New York authorities were wrongly attempting to remove them, the Crown responded in 1767 by ordering New York to halt making grants.

Both the 1764 and the 1767 Royal Orders manifest an intention to pacify the two British jurisdictions, not protect Native Americans. The Royal Instruction of 1761 and the Royal Proclamation of 1763 proved to be paper tigers. New Hampshire grantees were not dispossessed of the land or removed at the Crown's direction because Wentworth may have exceeded his prerogatives in conveying land occupied by Native Americans. After 1763, the Crown did not retract any authority to make grants in order to protect the aboriginal occupants in this area, but instead merely attempted, as the trial court stated, to end the two provinces' dispute over who had jurisdiction. See *The New Hampshire Grants* vii (A. Batchellor ed. 1895).

The question was whether New York or the New Hampshire grantees had the right to assert dominion over the lands, not whether dominion over the land could be asserted at all by any European settlers. The necessary and inevitable outcome of the Crown's position would still be that Europeans would appropriate the area, especially since settlement of the lands was a British goal during this time. Orton, *supra*, at 35. These events are evidence of increasing European dominion adverse to the use and occupation of the Indians, to which the Crown impliedly consented.

▮▮▮▮ We agree with defendants that non-Indian, or "white," encroachment causing Indian withdrawal is not, in itself, effective to extinguish aboriginal rights. See *Ildefonso*, 513 F.2d at 1389 ("bare expectation" of white settlement does not amount to an intent to extinguish). We do, however, include the phenomenon of white settlement in our analysis as evidence of an intent to extinguish by the assertion of dominion over the area. This is because "[m]aking lands available for white settlement . . . in an appropriate factual context, constitute[s] termination of aboriginal ownership." *Id.*; see also *Gila River Pima-Maricopa Indian Community v. United States*, 494 F.2d 1386,

1391 (Ct. Cl. 1974) (authorized white settlement is one factor in determining when Indian title ceased and "'in an appropriate factual context' the opening up of an area for settlement can be tantamount to the ending of aboriginal title over the whole region"). Here, there was much more than "expectation." There was actual settlement and appropriation to the exclusion of other competing claims, and ratification by Congress when it admitted Vermont to the Union. Defendants' claims that the Abenakis never voluntarily abandoned the area and that they were never completely removed have no effect on a finding of an intent to assert complete control over the area in a manner adverse to the Abenakis.[9]

## B.

We also disagree with the trial court's assessment of Vermont's 1777 Constitution and the events that led to it. The court did not analyze the period of Vermont's independence as a part of the continuum leading to extinguishment. Instead, the court discarded this history as merely an expression of the "naked fee" doctrine, stating that even if the Wentworth Grants were valid, they were made subject to Native American occupancy rights:

> Although it is true that the Vermont Constitution recognizes the Wentworth Grants as a valid basis for land claims

---

[9] The actions of the sovereign, as opposed to the Indian response to it, determine whether or not there was the requisite "intent" to extinguish, but we view Indian conduct during this time as relevant because it shows the effect of the assertion of dominion by the Europeans on the Abenakis. Although, in general, Abenakis continued to occupy Vermont during this period, the changing nature of their presence reflects the tribe's response to the various events that occurred in the years leading to Vermont's admission to the Union. Until the first European contact in the early seventeenth century, no other tribe inhabited the Missisquoi homeland. There is evidence, however, of Abenaki resistance to European settlement. In 1766, at a meeting in Isle La Motte, attended by the Governor of Quebec and the Governor of New York, the Missisquoi Tribe complained of settlers in the area and that during the years 1775 to 1785, the Missisquoi had lost control of choice farmland. There is also evidence that in 1786 the tribe, although for the most part peaceful, threatened the use of force against the European settlers. Despite this evidence, it appears that the Abenaki response was predominantly passive—evidenced by retreat and withdrawal. Tribal presence continued through to the 1790's, but the tribe no longer controlled the area.

in Vermont, this *in itself*, does not accomplish extinguishment. The Wentworth Grants were made subject to aboriginal title and . . . there is nothing to indicate that Vermont's reaffirmation of these grants abrogated [Indian] rights. (Emphasis added.)

Without deciding whether Vermont legitimately achieved sovereignty, see J. Sweeney, C. Oliver and N. Leech, *The International Legal System* 851–929 (1988), we believe that the period from 1777 to 1791 provides continuity in the longstanding appropriation of the area that had been granted by Wentworth. See Vt. Const., preamble (1777). More importantly, the New Hampshire grantees' representations to Congress characterized the Wentworth Grants as though they had been granted by legitimate means by Wentworth in 1763. See Records of the Governor and Council, *supra*, at 318–19.

Appellees also argue that the area in dispute was not within Vermont's boundaries, even if the state was a sovereign entity. They claim that the northern boundary of the Vermont Republic extended only as far as "what is now central Vermont." Vermont's boundary extended to the latitude of forty-five degrees north—the current northern boundary. *Vermont v. New Hampshire*, 289 U.S. at 610. Congress therefore understood and intended the cession of Missisquoi territory, the final event resulting in the extinguishment of aboriginal rights.

We are cognizant of the federal decisions holding that a grant not rising to the level of an extinguishment conveys the naked fee only, thereby preserving aboriginal occupancy rights. See, e.g., *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 142–43 (1810). Nevertheless, the trial court's conclusion that the grants were insufficient to convey more than the naked fee, and that, therefore, later events could not produce an extinguishment is contrary to our view of the law as it applies to these facts. See, e.g., *Santa Fe*, 314 U.S. at 357–58 (grant made to Atlantic & Pacific Railroad Company conveyed the naked fee only, but later events clearly brought about an extinguishment because in this "historical setting" it could not be fairly implied that tribal rights were preserved).

The trial court failed to appreciate adequately the import of these particular land grants. More than mere ownership of the lands was at stake; these conveyances expressly required an

assertion of dominion. The requirement that settlement and cultivation commence and continue in order to avoid forfeiture directly undermined competing aboriginal rights to the land. The land grants' contingencies were inimical to the right of use by anyone else. The New Hampshire grantees ardently relied upon their rights to the land by virtue of the grants, and their assertion of dominion over the area inspired Vermont's revolt against New York and its stance as an independent republic. See *State v. Kirchoff*, 156 Vt. 1, 17, 587 A.2d 988, 998 (1991) (Springer, D.J., Specially Assigned, concurring) (purpose of 1777 Vermont Constitution was to make clear that the claims of New York were invalid, therefore "[p]rotection of citizens' rights to security in their land was a key motivating force in creating" that document). In short, the relevant focus is on what Vermonters intended to do with the land, not what hindsight discloses Governor Wentworth was authorized to do with it.

An examination of what transpired when Vermont was admitted to the Union further contradicts the notion that merely the naked fee was at stake. The 1791 Congress' understanding of the land disputes is clear from the preadmission negotiations and other legislation by which Vermont was admitted to the Union. See *Vermont v. New Hampshire*, 289 U.S. at 608–13 (describing the extensive preadmission negotiations between Vermont and Congress). Upon Vermont's admission, Congress recognized the land claims based on the representations of the grantees, which cannot be harmonized with the contention that the grantees possessed only the "naked fee." This limited property right "merely constitutes a reversionary interest that *becomes* possessory" upon extinguishment. Cohen, *supra*, at 489 (emphasis added). There is no doubt that Congress considered and intended the New Hampshire Grants, in 1791, to be possessory. See *Missouri, Kansas & Texas Ry. v. Roberts*, 152 U.S. 114, 117 (1894) (even though grant of Indian lands to the State of Kansas did not expressly extinguish aboriginal rights, extinguishment could be implied because grant necessarily involved possession and "was absolute in terms, covering both the fee and possession, and left no rights on the part of the Indians to be the subject of future consideration").

■ Therefore, even if the grantees initially held only the "naked fee," their reversionary interest vested in 1791, and any question of ambiguity was resolved by the act of Congress admitting Vermont as the fourteenth state. See *Gemmill*, 535 F.2d at 1149 ("any ambiguity about extinguishment that may have remained after the establishment of the forest reserves, has been decisively resolved by congressional payment of compensation to the Pit River Indians"); *Gila*, 494 F.2d at 1392–93 (in determining date of taking in order to compute compensation to Indians for loss of land, congressional act which authorized and ratified previous events may suffice as evidence of extinguishment); *Turtle Mountain Band of Chippewa Indians v. United States*, 490 F.2d 935, 947 (Ct. Cl. 1974) (establishment of reservation did not extinguish aboriginal title because there was no showing of proper congressional authorization).

■ We concede that the period preceding Vermont's statehood was a confusing era, and that valid questions remain as to the legitimacy of the opposing governing entities. Nevertheless, the tumultuous political context does not preclude a finding of extinguishment. See *Ildefonso*, 513 F.2d at 1387 (occurrence of extinguishment analyzed in light of "the particular facts, circumstances and history" of the case (citing *Santa Fe*, 314 U.S. at 357–58)). Vermont's admission to the Union provided closure to a long period of authority transferred from one body politic to another, giving final, official sanction to the previous events, and eliminating any remaining ambiguity about who had dominion over lands once controlled by the Abenakis. Short of an express statement declaring an intent to extinguish, it is difficult to imagine a demonstration of intent that could be more unequivocal than these cumulative events leading to statehood. We conclude that, by the year 1791, aboriginal rights to the area now known as St. Albans, Highgate and Swanton had been extinguished.

*Reversed and remanded for further proceedings.*